UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERVICE WOMEN'S ACTION NETWORK, | Case No. 12-cv-06005-EMC |
| Plaintiff, | |
| v. | **ORDER GRANTING DEFENDANT'S MOTION TO DISMISS** |
| JAMES N MATTIS, | Docket No. 110 |
| Defendant. | |

The instant action was initially filed in November 2012. The plaintiffs at that time included individuals as well as the Service Women's Action Network ("SWAN"). They challenged as unconstitutional "the official policy of the Department of Defense ('DoD') that categorically excludes . . . women[] from assignments to units whose primary mission is to engage in direct ground combat." Compl. ¶ 1. In January 2013, the then-Secretary of Defense announced that that policy (which dated back to 1994) was rescinded "effective immediately.'" *See* SAC ¶ 3. In spite of the Defense Secretary's statement, exclusion appeared to continue. In December 2015, the DoD announced that there would be no exceptions to "'the full implementation of . . . [r]escission.'" SAC ¶ 4. In proceedings before this Court, the government represented that "[t]he Military Services will use the same procedures that are currently used to select, assign, and train male service members." Docket No. 66 (Joint CMC St. at 7).

Notwithstanding the above, there remains a dispute in the instant case because, as alleged by the now sole remaining plaintiff SWAN, there are two new policies in place regarding placement of women in combat positions, both of which are unconstitutional based on sex discrimination. Currently pending before the Court is the current Defense Secretary's motion to dismiss. The Secretary argues that: (1) venue is improper in this District; (2) the case raises issues

that are not justiciable; and (3) SWAN lacks standing to sue.

Having considered the parties' briefs and accompanying submissions, as well as the oral argument of counsel, the Court hereby **GRANTS** the Secretary's motion based on standing only. SWAN has leave to file an amended complaint to address its standing to bring this case.

## I.    FACTUAL & PROCEDURAL BACKGROUND

In the operative second amended complaint ("SAC"), SWAN challenges two policies that came about following the rescission of the policy that categorically excluded women from combat: (1) the "Leaders First" policy, which is used by both the Army and Marines; and (2) a Marines training policy that segregates trainees by gender.

As alleged in the SAC, the Leaders First policy "require[s] junior enlisted women to wait to enter combat battalions until two or more 'women leaders' join[] those battalions." SAC ¶ 5; *see also* SAC ¶ 26 (alleging that "the Army decided that 'Leaders First' meant that two or more women officers or NCOs [noncommissioned officers], of any rank (not midgrade or senior women), needed to be assigned at the battalion level *before* junior enlisted women could be assigned to that battalion") (emphasis in original). According to SWAN, for the Army, the result of the policy is that, "in practice, brand new women infantry and armor second lieutenants are being assigned to just two brigades, one at Fort Bragg [in North Carolina] and one at Fort Hood [in Texas]. No other infantry or armor brigade has been opened to women." SAC ¶ 27. SWAN also alleges that "the problem is even more severe" in the National Guard where "only *two* states have met the 'Leaders First' requirement, Colorado and New Hampshire." SAC ¶ 29 (emphasis in original).

As for the Marines training policy, it "segregate[s] recruits who are entering into combat MOSs [military occupational specialties] along gender lines during their training for those positions. The Marines have, for example, an 'all-female Fourth Recruit Training Battalion.'" SAC ¶ 7.

According to SWAN, the above policies are based "at least in part" on the "animus towards servicewomen on the part of the DoD and the Administration. Defendant Mattis, President Trump, and the President's close advisors have expressed extreme hostility towards

Secretary Panetta's January 2013 announcement that women would be allowed to serve in some or all combat units." SAC ¶ 37.

## II.    DISCUSSION

As noted above, the Secretary makes three arguments in the pending motion to dismiss: (1) venue is improper in this District; (2) the case raises issues that are not justiciable; and (3) SWAN lacks standing to sue. Each argument is addressed below.

A.    Venue

Venue in the instant case is governed by subsection (e) of 18 U.S.C. § 1391. That provision states as follows:

> (e)    Actions Where Defendant Is Officer or Employee of the United States.
>
> (1)    In general. A civil action in which a defendant is an officer or employee of the United States or any agency thereof acting in his official capacity or under color of legal authority, or an agency of the United States, or the United States, may, except as otherwise provided by law, be brought in any judicial district in which (A) a defendant in the action resides, (B) a substantial part of the events or omissions giving rise to the claim occurred, or a substantial part of property that is the subject of the action is situated, or (C) the plaintiff resides if no real property is involved in the action.

28 U.S.C. § 1391(e). SWAN, as the plaintiff, has "the burden of showing that venue was properly laid in the Northern District of California." *Piedmont Label Co. v. Sun Garden Packing Co.*, 598 F.2d 491, 496 (9th Cir. 1979).

The dispute in the instant case is whether "a substantial part of the events or omissions giving rise to the claim occurred" in this District. *Id.* According to the Secretary, that standard has not been satisfied:

> [N]one of the events underlying Plaintiff's claims occurred in the Northern District of California, given that the government's decisions concerning women in combat were made in or around Washington, D.C. And, while Plaintiff asserts that "[t]he challenged policies and practices are enforced, and their impact is felt, throughout the Northern District of California . . . where the DoD maintains several bases," the events *giving rise* to Plaintiff's equal protection claims are Defendant's enactment of the "policies and practices" related to women in combat, which occurred in [or

3

around] Washington, D.C.

Mot. at 20-21 (emphasis in original).

The Secretary's argument is not persuasive.  SWAN asserts a constitutional claim, which is akin to a tort claim.  For instance, courts have drawn a parallel between § 1983 claims based on constitutional violations and tort common law.  *See, e.g.*, *OSU Student All. v. Ray*, 699 F.3d 1053, 1072 n.12 (9th Cir. 2012) (stating that, "like common law torts, constitutional torts require proximate cause"); *Lukovsky v. City & Cty. of S.F.*, 535 F.3d 1044, 1048 (9th Cir. 2008) (stating that, "[w]hen, as here, a federal civil rights statute does not include its own statute of limitations, federal courts borrow the forum state's limitations period for personal injury torts, which the parties agree in this case is one year under California law"); *Ziegler v. Indian River Cty.*, 64 F.3d 470, 474 (9th Cir. 1995) (stating that "[a] section 1983 claim for deprivation of a constitutional right is more akin to a tort claim than a contract claim" and "therefore analyz[ing] the question of purposeful availment [for personal jurisdiction] using the tort-case standard"); *see also Johnson v. City of Seattle*, 474 F.3d 634, 638 (9th Cir. 2007) (stating that, "[l]ike individual state officials, municipalities are only liable under Section 1983 if there is, at minimum, an underlying constitutional tort").

Therefore, for purposes of venue under § 1391, the Court looks to the general rule that, "in a tort action, the locus of the injury [is] a relevant factor."  *Myers v. Bennett Law Offices*, 238 F.3d 1068, 1076 (9th Cir. 2001).  As noted in one well-established legal treatise, "[i]n tort cases, courts tend to focus on where the allegedly tortious actions took place *and* where the harms were felt" when considering whether a substantial part of the events or omissions giving rise to the claim did or did not occur in the forum district.  Wright & Miller, 14D Fed. Prac. & Proc. Juris. § 3806 (4th ed.) (emphasis added; also noting that personal jurisdiction and venue should not be equated with one another but "[b]ecause venue under Section 1391(b)(2) is based upon a connection between the claim and the forum district, it is not surprising that some of the factors relevant to the venue assessment will overlap with those relevant to personal jurisdiction").  *See, e.g.*, *Seidel v. Kirby*, No. JKB-17-0292, 2017 U.S. Dist. LEXIS 178397, at *15 (D. Md. Oct. 27, 2017) (noting that "[t]he legally relevant 'occurrence' in a defamation action is where the publication occurred, i.e.[,]

where third persons were exposed to the material that would tend to damage the plaintiff's reputation") (emphasis omitted); *Horacek v. Burnett*, No. 07-11885, 2008 U.S. Dist. LEXIS 121905, at *4-5 (E.D. Mich. Jan. 9, 2008) (noting that, "[i]n an action involving a state agency or department, . . . it is not unusual that the defendant will be located in the state capitol" but "[t]hat does not mean that all such cases must be brought in the Western District, even when the named defendant is located there"; *e.g.*, "where action taken in the state capitol has an effect in the other district, venue in that other district is proper").

In addressing constitutional claims, courts have indeed looked to the place of injury in assessing venue. *See Cabellero v. Taylor*, No. 12-cv-8645, 2013 U.S. Dist. LEXIS 83459, at *8-9 (N.D. Ill. June 13, 2013) (in addressing a motion to transfer venue, noting that, "[a]lthough the alleged constitutional violation of forcing Cabellero to sign the registration forum under duress took place in the Central District, Cabellero lives and suffered the effects of the registration form publication in the Northern District" and "[t]here is some authority in this district for determining that venue is proper in the location in which a plaintiff felt the effects of a decision made in another district"). One district court has even suggested that, in some cases, the place of impact is more important than the place of decisionmaking for purposes of § 1391: "In a case brought on First Amendment grounds, impact becomes the most important part of the case" and "[m]inimizing the impact of the statute, compared to its adoption or administration, would marginalize the Plaintiff's substantive First Amendment claims under the guise of a venue statute." *Kalman v. Cortes*, 646 F. Supp. 2d 738, 742 (E.D. Pa. 2009); *cf. Passantino v. Johnson & Johnson Consumer Products, Inc.*, 212 F.3d 493, 504-05 (9th Cir. 2000) (addressing Title VII's venue provision which provides that suit may be brought in, *e.g.*, "'any judicial district in the State in which the unlawful employment practice is alleged to have been committed'"; holding that "the [Title VII venue] statute itself and analogous case law [on personal jurisdiction] suggest that venue should be found where the effect of the unlawful employment practice is felt: where the plaintiff works, and the decision to engage in that practice is implemented").

Therefore, in analyzing venue under § 1391 venue, the Court considers not simply where the decisions were made regarding the Leaders First and Marines training policies but also where

the decisions were implemented and its effects felt. With respect to the Leaders First policy as used by the Army, SWAN has shown that a substantial part of the events or omissions giving rise to its claims occurred in this District. First, the Army has several bases in this District; second, the policy has been implemented at those bases; and, third, the effect of the policy is that there are combat units in the District which are not yet integrated as a result of the challenged policy.[1] At the very least, there was no integration in this District at the time SWAN filed its SAC. *See Da Cruz v. Princess Cruise Lines, Inc.*, No. C-00-0867 TEH, 2000 U.S. Dist. LEXIS 15489, at *8 (N.D. Cal. Oct. 5, 2000) ("[V]enue is ordinarily determined as of the time an action is commenced. Thus, the state of the facts at the time the complaint was filed are the operative facts for determining venue.").[2]

As for the Marines training policy – as well as the Leaders First policy as used by the Marines – the Secretary points out that there are no Marine bases in this District (and SWAN does not seem to dispute such). This suggests that there are no impacts in this District as a result of the two policies. Nevertheless, as SWAN points out, under the pendent venue doctrine, when one or more claims are closely related (*e.g.*, arise out of a common nucleus of operative facts), venue is proper as to all claims so long as venue is established for just one claim. This is because, where there is a close relationship, then judicial economy, convenience, and fairness all weigh in favor of adjudication in one proceeding. *See Beattie v. United States*, 756 F.2d 91, 101-03 (D.C. Cir. 1984). *See also McNeary-Calloway v. JP Morgan Chase Bank, N.A.*, 863 F. Supp. 2d 928, 964-65 (N.D. Cal. 2012) (Spero, J.) (noting, that, "[g]enerally, venue must be established as to each cause of action [but,] if venue is proper on one claim, the court may find pendent venue for claims that are closely related"; adding that "[t]he decision to apply pendent venue to closely related claims is

---

[1] In his reply brief, the Secretary initially argued that, "[w]ith respect to the California Army National Guard, there is in fact at least one combat unit with female leaders currently in place, and thus no legal restraint on any women joining it." Reply at 9-10. However, the Secretary subsequently corrected himself and conceded that National Guard ""[u]nits in California . . . *may soon* meet the leaders first policy for specific companies." Mercer Decl. ¶ 5 (emphasis added). In other words, there is still no integration yet.

[2] For purposes of this opinion, the Court assumes that the proper reference point in time is the date the SAC was filed as opposed to, *e.g.*, the date this action was commenced.

a discretionary decision," and "[a] court may consider the principles of judicial economy, convenience, avoidance of piecemeal litigation, and fairness to the litigants in making its decision"); *Saravia v. Sessions*, No. 17-cv-03615-VC, 2017 U.S. Dist. LEXIS 192905, at *42 (N.D. Cal. Nov. 20, 2017) (stating that, "[w]here a case is built around a 'single wrong, common issues of proof, and similar witnesses,' pendent venue is more likely to be appropriate").

In the instant case, SWAN has adequately established that there is a close relationship between the Leaders First policy as used in the Army and the two Marines policies. Both are part of the DoD's implementation effort to achieve integration of women into combat units. There is likely some overlap in terms of issues and proof (*e.g.*, in the rationale of treating service women/female trainees differently from service men/male trainees). *Compare Beattie*, 756 F.2d at 103 (noting that a court "decline[d] to exercise pendent venue because it determined that the supplemental complaint arose out of a completely discrete set of circumstances"; indicating that where there is substantial identity of issues and proof, the pendent venue doctrine should apply). In any event, in his reply, the Secretary did not argue that the pendent venue doctrine does not apply to the instant case because of an absence of a close relationship; instead, the Secretary simply argued that venue is not proper as to *any* claims. *See* Reply at 10 n.8.

Accordingly, because the Court has venue over the Leaders First claim, the Court rejects the Secretary's motion to dismiss based on improper venue.

B.   Justiciability

According to the Secretary, even if venue is proper in this District, the instant case is "particularly ill-suited for judicial review" because it puts at issue a military decision, namely, "the method of assigning service members to combat units and of training them before they arrive to those units."[3]  Mot. at 8.  In other words, the Secretary contends that this case is nonjusticiable.

In evaluating the Secretary's justiciability argument, the Court begins by noting that courts

---

[3] Nonjusticiability should not be equated with a lack of jurisdiction. *See Sebra v. Neville*, 801 F.2d 1135, 1141 (9th Cir. 1986) ("Federal courts restrict their review of military decision-making not because they lack jurisdictional power to hear military disputes, but out of deference to the special function of the military in our constitutional structure and in the system of national defense. Military disputes thus raise questions of justiciability rather than jurisdiction.").

are not compelled "to abdicate their responsibility to decide cases and controversies merely because they arise in the military context." *Owens v. Brown*, 455 F. Supp. 291, 300 (D.D.C. 1978). Rather, as the district court noted in *Owens*, "the deserved margin of latitude afforded the political branches of government in rendering military judgments seems as a general matter to figure more prominently into whether particular decisions are lawful [*i.e.*, the merits of the case] than into whether they are susceptible to review at all." *Id.* In other words, deference, if any, to military judgment by the courts at most informs the substantive analysis (*e.g.*, degree of deference), not justiciability.

The district court in *Owens* pointed to several examples of courts assuming justiciability over claims arising out of the military context. For instance, in *Schlesinger v. Vallard*, 419 U.S. 498 (1975),

> a Navy lieutenant brought suit to challenge a federal statutory scheme that favored the promotion of women officers over men. Plaintiff claimed that this difference in personnel policy offended the equal protection guarantee of the fifth amendment. Ultimately, plaintiff's challenge was rejected by the Supreme Court. But significantly the Court did not reach this result by refraining from a decision on the merits based on notions of nonreviewability. Quite to the contrary, the Court resolved the dispute by applying substantive equal protection principles and by concluding that the disparate treatment occasioned by the statutory arrangement was rational because, as a result of 10 U.S.C. § 6015 (1970), "female lieutenants will not generally have compiled records of seagoing services comparable to those of male lieutenants."

*Owens*, 455 F. Supp. 2d at 300. Likewise, in *Frontiero v. Richardson*, 411 U.S. 677 (1973), "a statutory difference between male and female members of the uniformed services that involved entitlements to housing, medical, and dental benefits was stricken on equal protection grounds. A review of the Court's decision shows not the slightest hesitancy about reaching the merits even though military affairs were involved." *Owens*, 455 F. Supp. 3d at 301. Other examples include *United States v. Virginia*, 518 U.S. 515 (1996) (not discussing justiciability but instead focusing on the merits of whether Virginia's policy of excluding women from enrolling in its historically single-sex military college violated the Equal Protection Clause), and *Rostker v. Goldberg*, 453 U.S. 57 (1981) (not discussing justiciability but instead focusing on the merits of whether a federal statute authorizing the President to require the registration for the draft of men and not women was

constitutional).  *See also Philips v. Perry*, 106 F.3d 1420 (9th Cir. 1997) (addressing merits of plaintiff's argument that federal statute addressing homosexuality in the armed forces violated his right to equal protection); *Able v. United States*, 155 F.3d 628 (2d Cir. 1998) (same); *Doe v. Trump*, 275 F. Supp. 3d 167 (D.D.C. 2017) (addressing merits of claims brought by transgender service members and aspiring service members that directives issued by President violated their constitutional rights).

To be sure, there are extreme circumstances when courts have declined to address the merits of a case, citing nonjusticiability.  Most notable is *Gilligan v. Morgan*, 413 U.S. 1 (1973).  There, the plaintiffs were students at Kent State University in Ohio.  They filed suit after the governor called upon the National Guard in May 1970 to preserve civil order and protect public property.  According to the plaintiffs, the National Guard violated the students' rights of speech and assembly and caused injury to numerous students and death to several.  The Sixth Circuit

> held that the [plaintiffs'] complaint stated a cause of action with respect to one issue which was remanded to the District Court with directions to resolve the following question:
>
> "Was there and is there a pattern of training, weaponry and orders in the Ohio National Guard which singly or together require or make inevitable the use of fatal force in suppressing civilian disorders when the total circumstances at the critical time are such that nonlethal force would suffice to restore order and the use of lethal force is not reasonably necessary?"

*Id.* at 4.  The Supreme Court held that the plaintiffs' claim was not justiciable, particularly because of the plaintiffs' request for relief.  The Court underscored that

> this is not a case in which damages are sought for injuries sustained during the tragic occurrence at Kent State.  Nor is it an action seeking a restraining order against some specified and imminently threatened unlawful action.  *Rather, it is a broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard.*  This far-reaching demand for relief presents important questions of justiciability.
>
> Respondents continue to seek for the benefit of all Kent State students a judicial evaluation of the appropriateness of the "training, weaponry and orders" of the Ohio National Guard.  They further demand, and the Court of Appeals' remand would require, that the District Court establish standards for the training, kind of weapons and scope and kind of orders to control the actions of the National Guard.  Respondents contend that thereafter the District Court must

9

> assume and exercise a continuing judicial surveillance over the Guard to assure compliance with whatever training and operations procedures may be approved by that court. Respondents press for a remedial decree of this scope, even assuming that the recently adopted changes are deemed acceptable after an evidentiary hearing by the court. Continued judicial surveillance to assure compliance with the changed standards is what respondents demand.

*Id.* at 5-6 (emphasis added). The result in *Gilligan* was hardly surprising because the breadth of plaintiffs' request for relief would require a court to interfere with the basic, day-to-day functioning of the Ohio National Guard and on a continuing basis.

Bearing in mind the above case law, the Court now turns to the issue of whether the instant case is justiciable. In assessing justiciability of a challenge to a military decision, the Ninth Circuit has expressly embraced the Fifth Circuit's approach in *Mindes v. Seaman*, 453 F.2d 197 (5th Cir. 1971). *See Wenger v. Monroe*, 282 F.3d 1068, 1072-73 (9th Cir. 2002) (finding a case not justiciable where a personnel decision – failure to promote – was challenged).

> Under the *Mindes* test as modified by this Circuit, a person challenging a military decision generally must satisfy two threshold elements before a court can determine whether review of his claims is appropriate. "An internal military decision is unreviewable unless the plaintiff alleges (a) a violation of [a recognized constitutional right], a federal statute, or military regulations; and (b) exhaustion of available intraservice remedies." If the plaintiff alleges both of these things, a court weighs four factors to determine whether judicial review of his claims is appropriate. These factors include:
>
> (1) The nature and strength of the plaintiff's claim;
>
> (2) The potential injury to the plaintiff if review is refused;
>
> (3) The extent of interference with military functions; and
>
> (4) The extent to which military discretion or expertise is involved.

1.  Threshold *Mindes* Elements

Under the *Mindes* test, a court must first consider two threshold elements: whether a federal right is allegedly violated and whether there has been an exhaustion of intraservice remedies.

In the instant case, there is no dispute that the first threshold element has been satisfied: SWAN alleges a violation of a recognized constitutional right not to be discriminated against on

the basis of gender. However, the Secretary argues that the second threshold element – exhaustion of intraservice remedies – has not been met. *See* Mot. at 12. The Court does not agree for the following reasons.

First, SWAN is an organization, not a service member, and so it has no intraservice remedies available to it to exhaust. *Cf. Christoffersen v. Wash. State Air Nat'l Guard*, 855 F.2d 1437, 1441-42 (9th Cir. 1988) (acknowledging that the absence of an intraservice remedy does not preclude application of the *Mindes* test, but assuming exhaustion of all available remedies given that the Records Board could not provide effective relief).

Second, the purpose underlying the exhaustion requirement has been met in the instant case. The point of exhaustion is to give the military the opportunity to resolve the dispute in the first instance, thus obviating the need for litigation. But the Secretary has already been given that opportunity. This lawsuit began because of the blanket exclusion of women from combat units; the case was then essentially put on hold because of the government's decision to rescind that policy; and, although that policy has now been formally rescinded, the policies that have replaced it have still (at least allegedly) resulted in exclusion of women from combat units. The decision of the Army and Marines was the result of a lengthy process and took place while this litigation was pending. The views of Plaintiffs have been known to the Army and the Marines throughout their deliberative processes. Hence, the purpose of exhaustion has been satisfied.

Because both *Mindes* threshold elements have been satisfied, the Court may now consider the four "substantive" *Mindes* factors. *See Wenger*, 282 F.3d at 1073.

2.    First *Mindes* Factor

The first *Mindes* factor calls upon a court to evaluate the nature and strength of the plaintiff's claim. These are two different considerations.

With respect to the nature of a plaintiff's claim, the *Mindes* court underscored that constitutional claims are "normally more important than those having only a statutory or regulatory base"; however, even constitutional claims "are themselves unequal in the whole scale of values – compare haircut regulation questions to those arising in court-martial situations which raise issues of personal liberty." *Mindes*, 453 F.2d at 199. In the instant case, the Secretary has

11

not addressed the nature of SWAN's claim, focusing instead on the strength of the claim only. *See* Mot. at 12. That is problematic. The nature of the claim asserted by SWAN is important: SWAN is asserting a constitutional claim, not a statutory or regulatory one, and the constitutional claim implicates significant values. At stake is not, *e.g.*, a haircut regulation, but a policy that impedes the ability of women to serve in the military. At issue is an explicit gender-based policy that normally is subject to heightened scrutiny under the Equal Protection Clause of the Fourteenth Amendment and the Fifth Amendment as against the federal government.

As for the strength of SWAN's claim, the Secretary does not make any argument that the constitutional challenge fails on the merits under heightened scrutiny.[4] Rather, the Secretary simply argues that SWAN's claim is weak because SWAN "does not show that *any* service member has been denied a combat billet due to the 'Leaders First' policy or the policy that govern Marine Corps Recruit Training." Mot. at 12 (emphasis in original). But this argument mischaracterizes SWAN's operative complaint. For example, as reflected in ¶ 27 of the SAC, SWAN has a problem with the Leaders First policy because, with respect to the Army, "in practice, brand new women infantry and armor second lieutenants are being assigned to just two brigades one at Fort Bragg and one at Fort Hood. No other infantry or armor brigade has been opened to women." SAC ¶ 27. Furthermore, SWAN alleges that there is further injury to service women because "the Army [has] ended up with more women infantry and armor officers than anticipated, so that today, there is a surplus of these new officers at the designated brigades [in Fort Bragg and Fort Hood], also effectively *segregating* them from the rest of the Army." SAC ¶ 27 (emphasis omitted and added). SWAN is also critical of the Marines training policy because it segregates expressly on the basis of sex. *See* SAC ¶ 35.

The first *Mindes* factor therefore weighs in favor of judicial review.

---

[4] Assessing the strength of Plaintiffs' claims at this stage is not to be overly rigorous. In *Mindes*, the Fifth Circuit commented: "An *obviously* tenuous claim of any sort must be weighted in favor of declining review." *Mindes*, 453 F.2d at 199 (emphasis added). This appears to set a low bar. *See Nieszner v. Mark*, 684 F.2d 562, 564 (8th Cir. 1982) (indicating that the first *Mindes* factor should not be understood to be a prejudgment on the merits; focusing on the use of the word "tenuous").

3.    Second *Mindes* Factor

The second *Mindes* factor is the potential injury to the plaintiff if judicial review is refused. As an initial matter, it is not clear whether the Court's inquiry here should be limited to injury to SWAN only, or whether it may also consider injury to service women.  The Court need not decide that legal issue because the Secretary proceeds with the assumption that the Court should consider injury to service women (in fact, ignores any injury to SWAN itself).  *See* Mot. at 12 (arguing that the first two *Mindes* factors weigh against SWAN because it "does not show that *any* service member has been denied a combat billet" due to the challenged policies) (emphasis in original).

So framed, the potential injury to service women is significant – *e.g.*, being denied assignment to any brigades outside of Fort Bragg and Fort Hood (for the Army) and being subject to segregation on the basis of sex (both Army and Marines).  And even if the Court were confined to consideration of only SWAN's injury, that injury is not insignificant.  As discussed in Part II.C below (addressing standing), DoD's policies appear to have had an economic impact on SWAN, and the Ninth Circuit has recognized that an economic injury is enough to establish an injury for purposes of the second *Mindes* factor.  *See Christoffersen*, 855 F.2d at 1444 (noting that "[t]he potential injury to [plaintiffs who were not selected for retention in the Air Force National Guard] is primarily economic" – a loss of military and civilian employment and eligibility for civil service retirement benefits; ultimately concluding that the second *Mindes* factor weighed in plaintiffs' favor).

4.    Third and Fourth *Mindes* Factors

"The third and fourth *Mindes* factors, 'the extent of interference with military functions' and 'the extent to which military discretion or expertise is involved,' are generally considered together." *Wenger*, 282 F.3d at 1075.  This makes sense in that the greater the military expertise, the more likely the interference with military functions.  *Cf. Mindes*, 453 F.2d at 201-02 (stating that "[c]ourts should defer to the superior knowledge and experience of professionals in matters such as promotions or orders directly related to specific military functions").  However, to be given weight under *Mindes* and *Wenger*, the interference must be significant.  As the *Mindes* court noted, "[i]nterference per se is insufficient since there will always be some interference when

13

review is granted, but if the interference would be such as to *seriously impede* the military in the performance of vital duties, it militates strongly against relief." *Mindes*, 453 F.2d at 201 (emphasis added).

The classic example of interference is *Gilligan* where the demand for relief made by the plaintiffs constituted "a broad call on judicial power to assume continuing regulatory jurisdiction over the activities of the Ohio National Guard." *Gilligan*, 413 U.S. at 5. In the Ninth Circuit, interference has also been found where discrete, individualized military personnel decisions are at issue. For example, in *Gonzalez v. Department of Army*, 718 F.2d 926 (9th Cir. 1983), the plaintiff alleged intentional race discrimination in violation of 42 U.S.C. § 1981 based on a failure to promote. The Ninth Circuit held that the claim was not justiciable and, with regard to interference, noted as follows:

> The interference with the Army if appellant's claims were reviewed would be significant. The officers who participated in reviewing appellant's performance would have to be examined to determine the grounds and motives for their ratings. Other evidence of appellant's performance would have to be gathered for the 10-year period in question. In short, the court would be required to scrutinize numerous personnel decisions by many individuals as they relate to appellant's claim that he was improperly denied promotion. This inquiry would involve the court in a very sensitive area of military expertise and discretion.

*Id.* at 930; *see also Wenger*, 282 F.3d at 1075-76 (promotion[5]); *Christoffersen*, 855 F.2d at 1444 (retention); *Sebra v. Neville*, 801 F.2d 1135, 1142 (9th Cir. 1986) (transfer).

---

[5] In *Wenger*, the Ninth Circuit looked to *Gonzalez* as its guide:

> Like Gonzalez, Wenger claims that misconduct by the Guard cost him a promotion. To determine whether a flag was appropriately placed on Wenger's record, and whether the investigation of the Dining-In incident was conducted properly, a court would have to review all the details of the placement of the flag and the conduct of the investigation. Thus, as in *Gonzalez*, review in this case would require a court to scrutinize numerous decisions made by various individuals, and would necessarily "involve the court in a very sensitive area of military expertise and discretion." Accordingly in this case, as in *Gonzalez*, the third and fourth Mindes factors weigh against reviewability.

*Wenger*, 282 F.3d at 1076.

14

1        The Secretary tries to categorize the above Ninth Circuit cases and others like them as

2   military "assignment" cases, and argues that "assignment" cases are typically found

3   nonjusticiable.  *See* Mot. at 8-9.  But this argument is not convincing because, even though the

4   Ninth Circuit has stated that "federal courts should not review internal military decisions such as

5   duty orders or duty assignments," *Schlanger v. United States*, 586 F.2d 667, 671 (9th Cir. 1978),

6   that statement must be taken in context.  More specifically, that statement was made in the context

7   of evaluating the second *Mindes* factor, *i.e.*, the potential injury to the plaintiff if review were

8   refused.  The Ninth Circuit indicated that the potential injury would be greater in, *e.g.*, the

9   discharge situation as opposed to the assignment situation.  *See id.* at 672 (stating that the plaintiff

10   "seeks review of a decision of the USAF to remove him from AECP [Airman's Education and

11   Commissioning Program] and reassign him elsewhere"; this decision is not like a discharge

12   decision – while plaintiff "may suffer certain collateral consequences from having the removal

13   remain in his USAF record, the military decision to remove him from the AECP does not subject

14   him to consequences as serious" as a discharge).

15        Thus, a proper assessment of the degree of interference threatened by a lawsuit is informed

16   by whether the Court will be required to scrutinize particular personnel decisions (such as an

17   assignment) by many decisionmakers (as in *Gonzalez*) or called upon to take on a comprehensive,

18   ongoing supervisory role, displacing military management over a broad range of policy decisions

19   (as in *Gilligan*).  The case at bar falls under neither of those extremes.

20        The relief sought here would not require the Court to exercise continuing comprehensive

21   regulatory supervision over a wide range of military decisions.  Instead, SWAN is asking that two

22   discrete policies be held unconstitutional and thereby enjoined, and that the Army and Marines

23   conform with the policies and practice of other branches of the military which have drawn no

24   similar gender-based distinctions.  Nor do Plaintiffs challenge discrete, individualized personnel

25   decisions based on a multitude of personnel-type judgments of many.  Rather, SWAN is

26   contesting two broadly applicable facial policies that have been adopted by the Army and the

27   Marines.

28        The Secretary contends that the latter fact means judicial review of the instant case should

involve even more interference.  According to the Secretary, "[t]he impact of judicial review on the military if an organization was allowed to challenge 240,000 military assignment decisions dramatically magnifies those concerns" present with only a single service member's challenge.  Mot. at 12.  The Secretary's position is not supported by case law.

For example, in *Dillard v. Brown*, 652 F.2d 316 (3d Cir. 1981), the plaintiff was a female service woman who was discharged from the National Guard pursuant to a regulation forbidding the enlistment of single parents with minor, dependent children.  *See id.* at 317.  The plaintiff claimed, *inter alia*, that the regulation discriminated against women on its face and also as applied.  *See id.* at 319.  The Third Circuit held that the claim was justiciable, relying in large part on the Supreme Court's *Gilligan* decision.

> *Gilligan* does not stand for the proposition that issues concerning the operation of the National Guard are necessarily committed to the coordinate political branches.  The Supreme Court held only that a federal court could not exercise continuing regulatory jurisdiction over the National Guard.  The plaintiffs in *Gilligan* were not merely seeking to have the Court hold that certain practices or regulations were unconstitutional.  Rather they sought to vest virtual control of the Ohio National Guard in a federal court.

*Id.* at 321.  In contrast to *Gilligan*,

> [h]ere, . . . Dillard has complained that her constitutional rights have been violated by a specific military regulation and its application.  Her challenge, unlike that of the plaintiffs in *Gilligan*, does not require a court to engage in an ongoing supervision of the National Guard.  A court by considering Dillard's claims is not usurping the responsibility constitutionally committed to a coordinate branch.  Nor is the court here asked to engage in a task for which is has no competence.  Dillard merely seeks constitutional review of a regulation by a federal court, a task which traditionally and constitutionally has been committed to such a forum. . . .  Consequently, in Dillard's case there is present neither the level of intrusion into the responsibilities of the coordinate political branches nor the lack of competence of the judicial branch that was found in *Gilligan*.

*Id.*

Likewise, in *Owens*, the plaintiffs were female Navy personnel who filed a class action, seeking to remove a statutory bar that prevented them from being assigned to duties aboard Navy vessels.  The district court held that the case was justiciable, relying in large part on *Gilligan*.

16

> Contrary to defendants' contention, a decision favorable to the plaintiffs in this case will most assuredly [n]ot have the effect of requiring "continuing judicial surveillance" over discretionary military activities. Far from doing that, a decision in plaintiffs' favor will simply lift the bar contained in [the statute] that currently prevents defense authorities from exercising [t]heir discretion regarding female utilization in the manner [t]hey see fit. Unlike in *Gilligan*, a decision here will properly leave to experts the task of making "(t)he complex, subtle and professional decisions as the composition, training, equipping, and control of a military force."

*Owens*, 455 F. Supp. 2d at 302.

Moreover, in *Dibble v. Fenimore*, 339 F.3d 120 (2d Cir. 2003), the Second Circuit recognized that some courts "have characterized the governing rule [on justiciability] as allowing equitable challenges to personnel decisions only when they constitute facial challenges to the constitutionality of military regulations, and not in cases of discrete individualized actions." *Id.* at 126. The court observed that "[t]here is a vast difference between judicial review of the constitutionality of a regulation or statute of general applicability and judicial review of a discrete military personnel decision" because, "[i]n the first instance, a legal analysis is required[,] one which courts are uniquely qualified to perform," while "[t]he second involves a fact-specific inquiry into an area affecting military order and discipline and implicating all the concerns on which *Feres* and *Chappell* are premised." *Id.* at 127.[6]

As a final point, the Court notes that, even when pressed at the hearing, the Secretary failed to show that there is any special military expertise involved in the instant case or that the Court is being asked to engage in a task for which it has no competence. The military does not have any special expertise on gender integration. *Cf. Dunlap v. Tenn.*, 514 F.2d 130, 133 (6th Cir.) (stating that, "[i]n one sense, all decisions by military personnel are military in nature[,] [b]ut decisions which are made for non-military reasons involving no application of military expertise may well be outside the boundaries of the doctrine of nonreviewability"), *rev'd on other grounds*, 426 U.S.

---

[6] *See Bowen v. Oistead*, 125 F.3d 800, 803 (9th Cir. 1997) (explaining that, in *Feres*, "the Supreme Court held that members of the armed services could not sue the Government for injuries that 'arise out of or are in the course of activity incident to service'" and that, in *Chappell*, "[t]he Supreme Court has held that *Feres* applies not only to tort actions brought under the Federal Tort Claims Act but to *Bivens* actions as well").

312 (1975). Courts regularly assess claims of disparate treatment under the Equal Protection Clause, and scrutiny of discrimination by the military is not uncommon. Justification for class-based exclusions from the military or portions thereof, despite justification based on, *e.g.*, morale or combat readiness, are not beyond the ability of the courts to adjudicate. *See, e.g.*, *Rostker*, 453 U.S. at 57 (addressing merits of whether a federal statute authorizing the President to require the registration for the draft of men and not women was constitutional); *Philips*, 106 F.3d at 1420 (9th Cir. 1997) (addressing merits of plaintiff's argument that federal statute addressing homosexuality in the armed forces violated his right to equal protection); *Doe*, 275 F. Supp. 3d at 167 (addressing merits of claims brought by transgender service members and aspiring service members that directives issued by President violated their constitutional rights). Carried to its logical extent, under the government's position herein, even race-based exclusions from the military or racial segregation within would be immune from judicial review. *See also Philips*, 106 F.3d at 1439 (Fletcher, J., dissenting) (noting that, "[d]espite the deference due the military, there is no doubt that were the government today to exclude African-Americans from the military, the courts would easily reject the military's assertions of 'unit cohesion,' 'morale,' and 'discipline' and strike down the policy as violative of equal protection"). It is too late in the day for any such argument.

Because all *Mindes* considerations weigh in favor of judicial review, the Court denies the Secretary's motion to dismiss on nonjusticiability grounds.

C.      Standing

Finally, the Secretary challenges SWAN's standing to bring this action. Because the Secretary makes only a facial, and not a factual, challenge to standing, the Court focuses on the allegations made in the SAC. *See Phillips v. Apple Inc.*, No. 15-CV-04879-LHK, 2016 U.S. Dist. LEXIS 53148, at *8 (N.D. Cal. Apr. 19, 2016) (noting that, "'[i]n a facial attack [on standing under Federal Rule of Civil Procedure 12(b)(1)], the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction'"); *cf. Safe Air For Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004) (noting that "[a] Rule 12(b)(1) jurisdictional attack may be facial or factual" – "[i]n a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction"

while, "in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction"). SWAN's complaint contains the following allegations regarding its standing.

> 13. [SWAN] is a nonpartisan, nonprofit organization that supports, defends, and empowers servicewomen and women veterans through advocacy initiatives and community programs. Its mission includes transforming military culture by securing equal opportunity and freedom to serve without discrimination, harassment, or assault. SWAN also seeks to reform veterans' services to ensure high quality benefits for women veterans and their families.
>
> 14. SWAN's mission and goals are frustrated by the DoD's combat segregation policies and practices, which limit women's opportunities for advancement in the military, and create significant issues and obstacles for servicewomen that they then raise with, and seek assistance from, SWAN. Because of the current segregation policy and practice, SWAN has had to divert its resources to address the inequities, uncertainties and harms to the military caused by the DoD's segregation policies and practices. SWAN regularly fields complaints from junior enlisted women and from women "leaders" in the Army and Army National Guard concerning the effect of "Leaders First" on their accession and advancement opportunities, and on their relationships with their male colleagues and superior officers. SWAN also expends resources responding to reports of disadvantages faced by female Marines entering combat MOSs and the rates of sexual harassment and assault that they experience, stemming in part from the stigma imparted by their segregation from male colleagues at basic training.
>
> 15. The DoD's decision to rescind its 1994 directive excluding women from assignment to ground combat units has not reduced the work SWAN must do to combat the ill effects of the DoD's ongoing exclusion and segregation of servicewomen. On the contrary, SWAN must address the serious issues raised by servicewomen regarding the obstacles created by the DoD's segregation policies and practices and must continue to advocate for their elimination. If the DoD ceased its segregation policies and practices, SWAN could reallocate its resources to advancing its overall mission of promoting and empowering active and retired servicewomen.

SAC ¶¶ 13-15.

SWAN argues that it has made sufficient allegations to support standing based on the Supreme Court's decision *Havens Realty Corp. v. Coleman*, 455 U.S. 363 (1982), and its progeny. In *Havens*, the plaintiffs claimed that the defendants – a company that owned several apartments and one of its employees – engaged in "racial steering" in violation of the Fair Housing Act. One of the plaintiffs was HOME, a nonprofit corporation whose purpose (as stated in the complaint)

was to make equal opportunity in housing a reality in the Richmond, Virginia, area. *See id.* at 368. HOME's "activities included the operation of a housing counseling service, and the investigation and referral of complaints concerning housing discrimination." *Id.* HOME alleged injury because (as stated in the complaint) it "'has been frustrated by defendants' racial steering practices in its efforts to assist equal access to housing through counseling and other referral services. . . . HOME has had to devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices.'" *Id.* at 378. The Supreme Court held that,

> [i]f, as broadly alleged, petitioners' steering practices have perceptibly impaired HOME's ability to provide counseling and referral services for low- and moderate-income homeseekers, there can be no question that the organization has suffered injury in fact. Such concrete and demonstrable injury to the organization's activities – with the consequent drain on the organization's resources – constitutes far more than simply a setback to the organization's abstract social interests.

*Id.* at 379. The Ninth Circuit has elaborated that "an organization suing on its own behalf can establish an injury when it suffered 'both a diversion of its resources *and* a frustration of its mission.'" *La Asociacion de Trabajadores de Lake v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010) (emphasis added).

The Ninth Circuit has applied the *Havens* standard in multiple cases. For example, in *National Council of La Raza v. Cegavske*, 800 F.3d 1032 (9th Cir. 2015), the plaintiffs were civil rights organizations who sued Nevada state officials for allegedly violating the National Voter Registration Act. One of the organizations was National Council of La Raza ("NCLR"). As described in the complaint, NCLR is the largest national Latino civil rights and advocacy organization in the United States and regularly conducts registration drives in Nevada. According to the complaint, Nevada's violation of the voting act caused NCLR "to expend additional resources in performing its voter registration mission: 'Due to defendants' ongoing violations of the NVRA, NCLR has expended additional resources, including staff and volunteer time, on efforts to assist individuals with voter registration (including updating prior voter registration) who should have been offered voter registration through Nevada's public assistance offices.'" *Id.* at 1036-37. The other plaintiff-organizations made similar allegations in support of organization

20

standing. *See id.* at 1037 (noting that two NAACP chapters alleged that the defendants' violation of the voting act "caused them to expend additional resources in performing their voter registration missions"). In short, "[a]ll three plaintiffs allege[d] that Nevada's failure to comply with Section 7 of the NVRA has caused them to expend additional resources, and that 'but for' the State's failure they would have spent these resources to accomplish other aspects of their organizational missions, such as voter education and registering voters not covered by the NVRA." *Id.* at 1039. "The complaint . . . clearly alleges that Plaintiffs changed their behavior as a result of Nevada's alleged violation of Section 7. The complaint specifically alleges that Plaintiffs expended additional resources that they would not otherwise have expended, and in ways that they would not have expended them." *Id.* at 1040.

Another Ninth Circuit case applying *Havens* is *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC*, 666 F.3d 1216 (9th Cir. 2012). There, the Fair Housing Councils ("FHCs") of two cities sued Roommate.com, "alleging that the website's questions requiring disclosure of sex, sexual orientation and familial status, and its sorting, steering and matching of users based on those characteristics, violate[d] the Fair Housing Act and the California Fair Employment and Housing Act." *Id.* at 1218. The Ninth Circuit rejected Roommate's contention that the FHCs lacked standing, explaining as follows.

> Prior to commencing litigation, the FHCs investigated Roommate's alleged violations and, in response, started new education and outreach campaigns targeted at discriminatory roommate advertising. The resources spent on those campaigns were not associated with litigation. Because Roommate's conduct caused the FHCs to divert resources independent of litigation costs and frustrated their central mission, we conclude that the FHCs have organizational standing.

*Id.* at 1219.

Of course, a setback to the organization abstract social interest *without* a discussion of resources would not suffice under *Havens*. *See Project Sentinel v. Evergreen Ridge Aparts.*, 40 F. Supp. 2d 1136, 1139 (N.D. Cal. 1999) (Walker, J.) (holding that plaintiff-organization failed to meet the *Havens* standard because its complaint "alleges nothing more than a setback to the organization's abstract social interest in gaining compliance with fair housing laws" and did not

21

1   allege, *e.g.*, that "it provides any service or is engaged in any other enterprise independent of this

2   action that might be frustrated by defendants' allegedly unlawful conduct"); *see also Havens*, 455

3   U.S. at 379 (stating that the "concrete and demonstrable injury to the organization's activities –

4   with the consequent drain on the organization's resources – constitutes far more than simply a

5   setback to the organization's abstract social interests").

6           In the instant case, whether the challenged policies of the DoD constitutes more than a

7   setback to SWAN's abstract social interest is not clearly stated.  While SWAN – like the *La Raza*

8   plaintiffs – alleges it has had to divert resources to address the inequities and harms caused by the

9   allegedly unconstitutional DoD policies,[7] the allegations are conclusory.  SWAN does not provide

10  any specificity in describing (1) from what and (2) to what its resources have been reallocated.

11  For example, on (1) SWAN refers to "advocacy initiatives and community programs," SAC ¶ 13,

12  but gives no information about what those initiatives and programs are.  On (2), SWAN alleges

13  that it "fields complaints" and has responded to reports of disadvantages faced by service women

14  as a result of the policies, but it does not allege, *e.g.*, that it has had to devote more resources to

15  providing, *e.g.*, counseling and assistance in a manner similar to that provided by NCLR in *La

16  Raza*.[8]  Indeed, the complaint does not clearly allege whether SWAN typically takes any action or

17  provides services beyond fielding complaints.

18          The Court therefore holds that, based solely on the allegations in the complaint as pled,

19  SWAN has not sufficiently established standing.  The motion to dismiss for lack of standing is

20  granted, but SWAN has leave to amend.

21

22

23

24

25  [7] The Court disagrees with the Secretary's contention that SWAN has no standing because any
    harm to it is "self-inflicted" (*i.e.*, based solely on its own decision regarding resources allocation).
26  *See* Mot. at 15-15.  The allegations in the complaint fairly indicate that SWAN has had to divert
    resources *because of the DoD's conduct*.

27  [8] The Court does not consider the Watts declaration in evaluating standing; given the Secretary's
28  facial challenge, the Court looks only to the SAC.  Moreover, it is not clear that the Watts
    declaration is sufficient even if it could be considered.

### III.     CONCLUSION

The Secretary's motion to dismiss lacks merit to the extent it is based on claims of improper venue and nonjusticiability. The motion, however, is granted as the Court agrees with the Secretary that there are insufficient allegations in the SAC to support standing. SWAN has leave to file an amended complaint within four weeks of the date of this order.

This order disposes of Docket No. 102.

**IT IS SO ORDERED**.

Dated: May 1, 2018

_____
EDWARD M. CHEN
United States District Judge