# UNITED STATES DISTRICT COURT
# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SERVICE WOMEN'S ACTION NETWORK, <br><br> Plaintiff, <br><br> v. <br><br> JAMES N MATTIS, <br><br> Defendant. | Case No. 12-cv-06005-EMC <br><br> **ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS** <br><br> Docket No. 127 |

Plaintiff is Service Women's Action Network ("SWAN") a nonprofit "to support, connect and advocate for all military women, including current service members, but also veterans and future enlisted women." Docket No. 122 ¶ 13. Defendant is the Secretary of the Department of Defense, James N. Mattis. *Id.* ¶ 25. SWAN challenges as unconstitutional the "Leaders First" policy for the Army and Marines Corps, as well as the segregated training for the Marine Corps. *Id.* ¶ 6, 8. The Secretary moved for a motion to dismiss arguing that SWAN lacked both organizational and associational standing, and that SWAN has not stated a claim upon which relief can be granted. Docket No. 127.

The Court finds that SWAN has organizational standing to challenge both these policies. However, SWAN has failed to plead facts to establish associational standing to bring a claim on behalf of its members to challenge the "Leaders First" policy. SWAN has pled facts to establish associational standing to challenge the Marine Corps' segregated basic training. SWAN is granted leave to amend its Third Amended Complaint ("TAC") to allege factual allegations that it has a member who would have standing to challenge the "Leaders First" policy.

The Court also finds that SWAN has stated a claim upon which relief may be granted.

## I. FACTUAL & PROCEDURAL BACKGROUND

The original complaint in this matter was filed on November 11, 2012. Docket No. 1. The original complaint challenged the Department of Defense's 1994 policy that excluded women from ground combat. Docket No. 1 ¶ 1. On January 24, 2013, the Secretary of Defense at the time rescinded the 1994 policy, and stated that the integration of women into combat positions and units must be completed by January 1, 2016. Docket No. 66 at 1. However, on April 28, 2016, the parties in this matter filed a joint case management statement indicating that the "Leaders First" policy would be implemented; this policy requires establishing women leaders into the previously closed units before junior enlisted women are able to join those units. Docket No. 75 at 9-17. The Leaders First policy, adopted by the Army and Marine Corps, "preclude the assignment of women soldiers and Marines to a company-level unit until two or more women 'leaders' are assigned to the unit." *Id.* ¶ 34. The Armed Services assert that the "'Leaders First' policy furthers the goal of gender integration." *Id.* SWAN pleads that this policy

> (1) deprives junior enlisted servicewomen access to the full range of positions available to their male colleagues, because they are only able to be assigned to combat units in which women "leaders" are installed; (2) deprives women "leaders" access to the full range of positions in combat units because they are assigned based on the needs of the "Leaders First" policy; (3) communicates to male servicemembers and leaders in combat units that they have little or no responsibility for the development and advancement of servicewomen; (4) places unusual and unnecessary burdens on junior enlisted women, who are often required to ignore chain of command norms in order to seek counsel from their designated female "leaders"; (5) places unusual and unnecessary burdens on women "leaders," who are required to divert attention from their own professional development in their new roles in combat units to mentor and supervise junior enlisted women; and (6) causes resentment among male soldiers in combat units.

*Id.* ¶ 6.

Similarly, the Marine Corps "continue to segregate recruits for basic training into same-gender platoons. The Marine Corps is the only service branch that separates training along gender lines." *Id.* ¶ 7. SWAN claims that this policy is unconstitutional because it:

> (1) is premised on stereotypes about women's aptitude for military service; (2) deprives women of equal opportunity for training and mentorship, thus impairing their ability to successfully meet gender-

2

> neutral physical standards for their contracted MOSs and thereby to continue their training in those specialties; and (3) teaches male recruits and leaders to regard servicewomen as in need of protection, incapable of competing on equal footing with men, and otherwise as second-class members of the Marine Corps.

*Id.* ¶ 8.

On December 18, 2017, SWAN filed a Second Amended Complaint. Docket No. 107. On February 2, 2018, the Secretary filed a motion to dismiss for improper venue, lack of justiciability, and lack of standing. Docket No. 110. The Court granted the motion to dismiss on the grounds that SWAN lacked standing, but rejected the Secretary's arguments as to improper venue and lack of justiciability. Docket No. 118. Following the Court's order granting the Secretary's motion to dismiss, SWAN filed the TAC. Docket No. 122.

The TAC states that SWAN's goals include the empowerment and promotion of servicewomen. *Id.* ¶ 14. SWAN describes its main areas of focus as:

> (1) unifying servicewomen as a nationwide community, through in-person events and online engagement; (2) connecting servicewomen with the resources they and their families need, primarily through building partnerships with other organizations; and (3) amplifying the voices of servicewomen by advocating for them on a wide range of issues, by participating in coalitions, conducting a national survey on the needs of women in the military, and educating members of Congress as to those needs.

*Id.* ¶ 15.

In furtherance of its goals, SWAN engages in the following activities: (a) fielding on average ten phone calls, Facebook posts, and emails per month from servicewomen looking for assistance with legal services and other issues; (b) seeking partnerships and coalition building with other organizations that assist women veterans; (c) creating a database of services for women in the military; (d) keeping Congress informed on issues related to women in the military by having educational Hill visits for its members; (e) developing a three-year strategic plan which includes "establishing a 501(c)(4) arm, increase and diversify funding sources, to create an online Resource Portal, to develop strategic partnerships with other organizations that can provide resources to servicewomen, and to develop a prioritized engagement plan that sets forth how SWAN will educate and mobilize key stakeholders and members to support professional growth." *Id.* ¶ 16.

SWAN asserts that the policies at issue have forced it to "divert its resources from direct

1  advocacy promoting servicewomen and their needs during and after active service to engagement
2  and advocacy regarding the gender segregation policies and practices that are the subject of this
3  suit." *Id.* ¶ 14.  SWAN contends that it has been forced to redirect "its limited resources and
4  limited staff hours to answering questions from women who seek to enter combat roles, who are
5  entering these roles under the 'Leaders First' policy, or who are experiencing or who have
6  experience the segregated Marine Corps training." *Id.* ¶ 19.

      SWAN pleads that its servicewomen members describe concerns about career advancement and opportunities because of "Leaders First" and the Marine Corps segregated training. *Id.*  SWAN claims that these two policies have led to harassment from male counterparts. *Id.*  The TAC states that to cope with these inquiries and concerns, it must devote many hours of limited staff time. *Id.*

      Additionally, "in direct response to concerns raised through SWAN's Facebook page, SWAN staff held (and sponsored) a one-day 'Trailblazers Workshop' in Fort Hood, Texas in order to support the first class recruits trained for Army infantry roles at Fort Hood." *Id.* ¶ 20.  This workshop was to "support and connect these infantry women in their day-to-day struggles, and to brainstorm how to deal with the ramifications of the 'Leaders First' policy and the continuing barriers and stigmatizations it creates." *Id.* ¶ 20.  SWAN expressed an intention to hold another workshop in Fort Bragg, North Carolina. *Id.*

      SWAN claims that approximately 15% of its staff's work hours have been spent addressing concerns regarding the policies at issue in this matter. *Id.* ¶ 21.  SWAN has been forced to divert resources for "reaching out to Congress and other policymakers to advocate against these policies and practices, or connecting servicewomen to resources or networks that they need as they attempt to navigate military careers under these policies and practices." *Id.*  But for the policies at issue here, SWAN believes it would be able to spend its time and resources focusing on its strategic plan rather than wasting valuable time combatting the effects of these policies. *Id.*

      "SWAN is a membership organization." *Id.* ¶ 22.  SWAN's membership is comprised of servicewomen that communicate with SWAN through Facebook, phone calls, emails and through

its monthly e-newsletter. *Id.* In the TAC, SWAN shared stories of how these policies have impacted its members.

> For example, with respect to "Leaders First," SWAN has a member who is an Infantry Platoon Leader in the Army National Guard. Because of the "Leaders First" policy, this member was treated differently from her male counterparts by being denied the ability to take inactive guard status for six months at the beginning of her service while she completed the civilian training required for her job as a Denver Police Officer. This in turn led to her not being able to participate fully in the training of her National Guard cohort, which caused her to be perceived as getting different treatment from her male counterparts and ultimately ranked last as a Platoon Leader in the cohort.

*Id.* ¶ 23. SWAN also explained that members in the Marine Corps suffer harassment and stigmatization as a result of the segregated training. *Id.* ¶ 24. The TAC quotes one SWAN member explaining that

> The purpose of boot camp is to break down recruits by stripping them of their individuality, to form a team, to listen to superiors and act on their command without questions, and to "make Marines." The male experience is different in that misogyny, sexism, gender bias and the general hate that women have infiltrated their boys' club are taught during segregated boot camp and reinforced in male-only units.

*Id.*

Similarly, SWAN argues that because of "Leaders First," junior enlisted women are limited to certain units and positions. *Id.* ¶ 36. The TAC states that with respect to the National Guard only two states (Colorado and New Hampshire) have met the requirements for "Leaders First." *Id.* ¶ 37. SWAN contends that the "Leaders First" policy relegates "women, literally and figuratively, to a 'supporting role' in our Armed Forces based on stereotypes about women and assumptions about battlefield conditions that do not reflect the reality that women are already serving in combat situations, and doing so with distinction." *Id.* ¶ 40. The segregated training, SWAN believes, fosters an environment that leads to an increased likelihood of sexual harassment and sexual assault. *Id.* The TAC discusses how these policies are based in part on "animus towards servicewomen on the part of the DoD and the Administration." *Id.* ¶ 47.

On August 8, 2018, the Secretary filed a motion to dismiss arguing that the TAC must be dismissed because SWAN lacks standing and failed to state a claim upon which relief can be

5

granted. Docket No. 127. On September 27, 2018, the Court heard arguments from both parties on these two issues. Docket No. 133. The Court found that SWAN has standing to bring this cause of action and has stated a claim upon which relief can be granted. *Id.*

## II. DISCUSSION

A. Standing

The Secretary challenges SWAN's standing to bring this action. The Court previously addressed the issue of standing and dismissed the Second Amended Complaint because SWAN failed to plead sufficient facts showing organizational standing or associational standing. Docket No. 118 at 18–22. The Court specifically found that SWAN's allegations of standing were too conclusory. *Id.* at 22 ("SWAN does not provide any specificity in describing (1) from what and (2) to what its resources have been reallocated.").

To establish standing, a party must allege factual allegations showing the three requirements for standing are met. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992). The three requirements are: (1) there must be injury in fact, meaning an injury that is "concrete and particularized," and "actual or imminent"; (2) the injury must be "fairly traceable" to the defendant's conduct; and (3) it must be more than speculative that the injury will be redressable through success in the matter. *Id.* 560–61. The standing inquiry is "especially rigorous" when a court is deciding the constitutionality of another branch's actions. *Clapper v. Amnesty Intern. USA*, 568 U.S. 298, 408 (2013) (quoting *Raines v. Byrd*, 521 U.S. 811, 819–820 (1997)). "In deciding whether a plaintiff has made this showing, we 'accept as true all material allegations of the complaint' and 'construe the complaint in favor of the complaining party.'" *Nat'l Council of La Raza v. Cegavske*, 800 F.3d 1032, 1039 (9th Cir. 2015) (quoting *Maya v. Centex Corp.*, 658 F.3d 1060, 1068 (9th Cir. 2011)). SWAN claims that it has both organizational standing associational standing to challenge the two policies at issue here. Docket No. 128 at 2–8.[1]

---

[1] The Secretary presents for the first time in his Reply Brief the argument that *Gill v. Whitford* prevents the Court from addressing the issues raised in this matter. He argues that because "the Supreme Court found that a citizen did not have standing to challenge a gerrymandered district in a neighboring district within the citizen's state of residence" the Court cannot find standing here where "a Washington, D.C. based advocacy group, seeks to establish its standing without alleging that it has suffered any diversion of resources within the Northern District of California or even

1. Organizational Standing

An organization has standing to bring a claim on its own behalf if it can show that it has suffered due to a diversion of its resources to address a problem and that it has experienced a "frustration of its mission." *Fair Hous. Council of San Fernando Valley v. Roommate.com*, LLC, 666 F.3d 1216, 1219 (9th Cir. 2012) (quoting *Fair Hous. of Marin v. Combs*, 285 F.3d 899, 905 (9th Cir. 2002). It is not enough to "manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that otherwise would not affect the organization at all." *La Asociacion de Trabajadores de Lake Forest v. Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010). An organization "must instead show that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.* It "may sue only if it was forced to choose between suffering an injury and diverting resources to counteract the injury." *Id.* at 1088 n.4. In *Havens v. Realty Corp. v. Coleman*, the Supreme Court held that a consequent drain on an organizations resources can constitute concrete and demonstrable injury sufficient to establish organizational standing. In *Havens Realty Corp.*, the Court found standing where racial steering practices required the organization to "devote significant resources to identify and counteract the defendant's [sic] racially discriminatory steering practices" and frustrated its purpose. *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378-79 (1982) (alteration in original). The Ninth Circuit applied *Havens* in *Fair Housing Council of San Fernando Valley v. Roommate.com, LLC* and

---

within the State of California." Docket No. 129 at 5 n.3. This belatedly raised argument is waived. In any event, it is without merit. The Court has already addressed the issue of venue in this case. Docket No. 118. *Gill v. Whitford* was not an organizational standing case. The question of organizational standing addressed herein is distinct from the question of venue. In *Gill*, no plaintiff could establish injury - the Court found that "not a single plaintiff sought to prove that he or she lives in a cracked or packed district" and therefore plaintiffs were unable to show any injury. *Gill v. Whitford*, 138 S. Ct. 1916, 1932 (2018). Lack of injury, not venue, was the issue. In the same footnote in his reply brief, the Secretary belatedly argues that "as a practical matter it is also difficult to see how the Court's exercise of jurisdiction over the Marine Corps policies at issue could square with the Ninth Circuit's recent decision in *City & Cty. of S.F. v. Trump*, 897 F.3d 1225 (9th Cir. 2018), vacating a nation-wide injunction to the extent it applies outside of the State of California." Docket No. 129 at 5 n.3. The Secretary appears to assert that the Court cannot hear this matter because courts are barred from issuing nationwide injunctive relief; however, that is not the holding of that case. The Ninth Circuit stated "[w]e are unpersuaded by the Administration's arguments in favor of a blanket restriction on all nationwide injunctions. And we do not wish to interfere with the district court's considerable discretion in ordering an appropriate equitable remedy." City & Cty. of San Francisco, 897 F.3d at 1244–45.

7

found that an organization had standing where the organization "started new education and outreach campaigns targeted at discriminatory roommate advertising." *Fair Hous. Council of San Fernando Valley, LLC*, 666 F.3d at 1219. The Ninth Circuit held that "[b]ecause Roommate's conduct caused the FHCs to divert resources independent of litigation costs and frustrated their central mission" the organization had standing. *Id.* Similarly, the Ninth Circuit in *National Council of La Raza v. Cegavske*, applying *Havens*, found that an organization had standing where "[t]he complaint specifically allege[d] that Plaintiffs expended additional resources that they would not otherwise have expended, and in ways that they would not have expended them." *Cegavske*, 800 F.3d at 1040. In that case, the plaintiffs were unable to "allocate substantial resources to other activities central to [their] mission[s]." *Id.* (alteration in original).

Here, SWAN, in its Complaint, describes how "Leaders First" and the Marine Corps' segregated basic training frustrates its goal of empowering and promoting women in service. Docket No. 122 ¶ 14. Importantly, SWAN alleges in some detail how it has been forced to divert resources in response to these policies. For example, SWAN has alleged that "because of the policies and practices that are the subject of this suit, SWAN has had to redirect its limited resources and limited staff hours to answering questions from women who seek to enter combat roles, who are entering these roles under the 'Leaders First' policy, or who are experiencing or who have experienced the segregated Marine Corps training." *Id.* ¶ 19. SWAN also alleges that the services it provides to its members is impeded because "approximately 15% of its staff's work hours have been spent addressing concerns regarding the policies at issue in this matter." *Id.* ¶ 21. Not only has SWAN had to divert resources towards fielding questions from members in these programs, but "in direct response to concerns raised through SWAN's Facebook page, SWAN staff held (and sponsored) a one-day 'Trailblazers Workshop' in Fort Hood, Texas in order to support the first class recruits trained for Army infantry roles at Fort Hood." *Id.* ¶ 20. This workshop was directly focused on how women can deal with the "ramifications of the 'Leaders First' policy and the continuing barriers and stigmatizations it creates." *Id.*

In *Smith v. Pac. Properties & Dev. Corp.*, the Ninth Circuit found a sufficient "showing of a 'diversion of resources' and to survive a 12(b)(6) motion" where the plaintiff "specifically stated

8

in its complaint that 'in order to monitor the violations and educate the public regarding the discrimination at issue," the plaintiff had "to divert its scarce resources from other efforts to promote awareness of—and compliance with—federal and state accessibility laws and to benefit the disabled community in other ways (for example, [the organization's] efforts to free disabled persons from nursing homes.)." *Smith v. Pac. Properties & Dev. Corp.*, 358 F.3d 1097, 1105–06 (9th Cir. 2004). In this case, SWAN has similarly been forced to divert its scarce resources to fielding phone calls and putting on a workshop to combat the negative effects of the policies. But for the two policies at issue here, it would have used its limited budget towards its strategic plan. Docket No. 122 ¶ 21.

As the cases above demonstrate, such a specific allegation of diversion of resources suffices to establish organizational standing. Indeed, the Ninth Circuit has specifically found that diversion of resources for "outreach campaigns" and educating the public establishes a diversion of resources sufficient to establish organizational standing. *See Cegavske*, 800 F.3d at 1040 (finding that "The [Supreme] Court has also made clear that a diversion-of-resources injury is sufficient to establish organizational standing at the pleading stage, even when it is 'broadly alleged.'"); *Pac. Properties & Dev. Corp.*, 358 F.3d at 1105–06. Those cases are apposite here.

Therefore, SWAN has organizational standing to challenge the "Leaders First" policy and the segregated basic training in the Marine Corps.

2. Associational Standing

SWAN also argues that it has pled factual allegations that it has members who would have standing and therefore it can challenge the "Leaders First" policy and the Marine Corps segregated training based on associational standing. For SWAN to assert associational standing, it must show "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Associated Gen. Contractors of Am., San Diego Chapter, Inc. v. California Dep't of Transp.*, 713 F.3d 1187, 1194 (9th Cir. 2013) (citing *Associated Gen. Contractors of Am. v. Metro. Water Dist. of S. Cal.*, 159 F.3d 1178 1181 (9th Cir. 1998).

To show that a member would have standing to sue in his or her own right, the organization "must show that a member suffers an injury-in-fact that is traceable to the defendant and likely to be redressed by a favorable decision." *Associated Gen. Contractors of Am., San Diego Chapter, Inc.*, 713 F.3d at 1194.

In the TAC, SWAN gives examples of members who have previously suffered from the allegedly discriminatory policies at issue in this matter. Docket No. 122 ¶ 23 (describing a member who was denied the opportunity to take inactive status because she had to stay on as a leader for the purposes of the "Leaders First" policy); *Id.* ¶ 24 (describing how segregated boot camp leads to stigmatization). For example, SWAN asserts that a member "was treated differently from her male counterparts by being denied the ability to take inactive guard status for six months at the beginning of her service while she completed civilian training required for her job as a Denver Police Officer." Docket No. 122 ¶ 23. SWAN argues that this denial "led to her not being able to participate fully in the training of her National Guard cohort, which caused her to be perceived as getting different treatment from her male counterparts and ultimately ranked last as a Platoon Leader in the cohort." *Id.*

However, past injury alone is not sufficient to establish associational standing, particularly where the sole relief sought is prospective. *See Lujan*, 504 U.S. at 560 (requiring that an injury must be "actual or imminent, not 'conjectural' or 'hypothetical'"). *See also Summers v. Earth Island Institute*, 555 U.S. 488, 495 (2009) (rejecting standing in part "because it relates to past injury rather than imminent future injury that is sought to be enjoined."); *City of Los Angeles v. Lyons*, 461 U.S. 95 (1983). Furthermore, SWAN does not explain how the proposed injunctive relief sought, ending the Leaders First policy, would provide redress for the member being ranked last as a Platoon Leader. To establish standing for prospective injunctive relief, SWAN must show that a member "has suffered or is threatened with a 'concrete and particularized' legal harm," and has "'a sufficient likelihood that [she] will again be wronged in a similar way.'" *Bates v. United Parcel Service, Inc.*, 511 F.3d 974, 985 (9th Cir. 2007) (quoting *Lyons*, 461 U.S. at 111)."

In this case, the remedy SWAN seeks is "an order (1) enjoining Defendant from enforcing

or applying his gender segregation policies and practices; and (2) requiring Defendant to allow women to apply for and serve in all combat-related positions and schools in all brigades that are open to male soldiers, utilizing the same procedures and rules for the accession and assignment of women soldiers that are utilized for men." Docket No. 122, Prayer for Relief ¶ 2. This requested prospective relief would not redress the past harm of being denied the opportunity to seek inactive duty. *Bates*, 511 F.3d at 985 (recognizing that a plaintiff must establish a "real and immediate threat of repeated injury" and that "the claimed threat of injury must be likely to be redressed by the prospective injunctive relief"). In particular, removing the current policy would not redress the member for the harm of being "perceived as getting different treatment from her male counterparts and ultimately ranked last as a Platoon Leader in the cohort." Docket No. 122 ¶ 23. Additionally, SWAN has not alleged that it is likely that this member will again seek inactive guard status. Although the TAC generally alleges servicewomen are subject e.g. to resentment from males and harassment resulting from the Leaders First policy (see TAC, Paragraphs 6, 34, 36, and 40), the TAC does not specifically allege harm to its *members*. *See Bayaa v. United Airlines, Inc.*, 249 F. Supp. 2d 1198, 1203–04 (C.D. Cal. 2002) (rejecting associational standing where the plaintiff did "not claim that the eleven individuals allegedly [injured] . . . [were] its members"). The member described in Paragraph 23 of the TAC is the only member of SWAN which the TAC specifically alleges an injury from the "Leaders First" policy. As SWAN has not established that it has a *member* whose injuries resulting from the "Leaders First" policy would be redressed by the prospective relief SWAN seeks, SWAN has not established associational standing to seek that relief.

SWAN does claim that it has members "in the Marine Corps who continue to suffer harassment and stigmatization from their male counterparts based on the segregated training, which perpetuates a culture that differentiates and excludes women." Docket No. 122 ¶ 24. While SWAN does not state that it has members who will soon join the segregated basic training imminently or that it has members who are currently in the segregated basic training, SWAN does allege that it has members who currently are experiencing the harm (*e.g.*, harassment) from the sexist culture and connotation that arises from segregated basic training. *Id.* As to likelihood of

11

obtaining redress from the relief sought herein, it is plausible that ending the Marine Corps segregated basic training, which SWAN argues "perpetuates a culture that differentiates and excludes women" would change the culture that is causing harassment and stigmatizations for its members. Thus, SWAN has asserted an ongoing harm to its members that may be redressed by the prospective remedy sought herein at least for pleading purposes.

In order to establish associational standing, SWAN must also assert that "(b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Associated Gen. Contractors of Am., San Diego Chapter, Inc.*, 713 F.3d at 1194.

As to prong (b), SWAN describes its goals as seeking "to empower and promote servicewomen." Obtaining equal treatment of women in the military and preventing harassment and stigmatization of service women is germane to the organizations purpose of promoting and empowering women in military service. *See Greater Los Angeles Council on Deafness, Inc. v. Baldrige*, 827 F.2d 1353, 1358 (9th Cir. 1987) (finding an organization whose "members consist of deaf or hearing-impaired individuals" had representational standing because the organization sought "to protect the interests of [hearing-impaired] individuals and alleged that this was one of its objectives"). As to prong (c), the Secretary has not raised any arguments that the individual members must be a party to this lawsuit, nor does the Court find any reason why the servicewomen members would need to be a party to this lawsuit.

For the reasons stated herein, SWAN has alleged enough facts to establish associational standing to challenge the Marine Corps segregated basic training on behalf of its members for purposes of Defendant's motion to dismiss.

Although SWAN has not sufficiently alleged associational standing to challenge the "Leaders First" policy, it is given leave to amend its complaint to include factual allegations to establish associational standing as it relates to the "Leaders First" policy.

12

B. <u>Failure to State a Claim</u>[2]

When a Court evaluates a motion to dismiss for failure to state a claim upon which relief can be granted, it must "accept as true all factual allegations in the complaint and draw all reasonable inferences in favor of the nonmoving party." *Retail Prop. Trust v. United Bhd. of Carpenters & Joiners of Am.*, 768 F.3d 938, 945 (9th Cir. 2014). However, in order for a plaintiff's complaint to survive a 12(b)(6) motion to dismiss, it is required to plead "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). The Court is "not bound to accept as true a legal conclusion couched as a factual allegation." *Twombly*, 550 U.S. at 555; *accord Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.").

The Secretary argues that the Supreme Court's decision, *Trump v. Hawaii*, dictates the standard of review in this matter. Docket No. 127 at 18–22. The Secretary asserts that courts must be highly deferential when reviewing military decisions, *id.* at 24–25, and that under such deferential review, SWAN has failed to state a claim upon which relief can be granted. *Id.*

The Court does not agree. The highly deferential standard articulated in *Trump* does not apply here. *Trump* involved the decision of the Executive to deny admission to certain aliens from entering the country based on consideration of national security and foreign relations. In *Trump*, "[t]he Proclamation . . . sought to improve vetting procedures by identifying ongoing deficiencies in the information needed to assess whether nationals of particular countries present 'public safety threats.'" *Trump v. Hawaii*, 138 S. Ct. 2392, 2404, (2018). The Supreme Court recognized that "[t]o further that purpose, the Proclamation placed entry restrictions on the nationals of eight foreign states whose systems for managing and sharing information about their nationals the

---

[2] The Court rejects SWAN's argument that under 12(g) the Secretary cannot raise a motion to dismiss for failure to state a claim because of a previous motion to dismiss the Second Amended Complaint. The Ninth Circuit has held that "[d]enying late-filed Rule 12(b)(6) motions and relegating defendants to the three procedural avenues specified in Rule 12(h)(2) can produce unnecessary and costly delays, contrary to the direction of Rule 1." *In re Apple Iphone Antitrust Litig.*, 846 F.3d 313, 318 (9th Cir. 2017), *cert. granted sub nom. Apple Inc. v. Pepper*, 138 S. Ct. 2647 (2018). In light of the Ninth Circuit's approach to late filed motions, the Court will consider the Secretary's 12(b)(6) motion to dismiss.

13

1 President deemed inadequate."

*Trump* was animated by two important factors: (1) plaintiffs sought "to invalidate a national security directive regulating entry to aliens abroad" and (2) that the executive order was "facially neutral toward religion." *Id.* at 2418. Furthermore, the Court explained that "[f]or more than a century, this Court has recognized that the admission and exclusion of foreign nationals is a 'fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control.'" *Id.* (quoting *Matthews v. Diaz*, 426 U.S. 67, 81 (1976)).

The present case is distinguishable from *Trump* in multiple ways. This case, unlike *Trump*, involves a facially discriminatory policy that treats men and women differently. *Trump*, 138 S. Ct. at 2418. The facial neutrality of the executive order in *Trump* informed the Court's deferential standard. *Id.* Unlike a facially neutral policy, there is no need to inquire into the deliberative process and discern intent and motive of the executive branch. The deferential standard in Trump concerned that inquiry.

Second, *Trump* involved the intersection of immigration policy and national security. *Trump* observed in particular that the "narrow standard of review 'has particular force' in admission and immigration cases that overlap with 'the area of national security.'" *Trump*, 138 S. Ct. at 2419 (quoting *Kerry v. Din*, 135 S.Ct. 2128, 2140 (2015) (Kennedy, J., concurring in judgment)). Nor does the case at bar pertain to the admission of foreign nationals outside the United States; *Trump* dealt with the admission and exclusion of foreign nationals who traditionally have been understood to be "largely immune from judicial control." *Id.* at 2418. In contrast, the case at bar concerns U.S. citizens and residents qualified to serve in our armed services, persons who enjoy the full measure of protection under the constitution. *Yick Wo v. Hopkins*, 118 U.S. 356, 369 (1886).

Furthermore, the "[j]udicial inquiry into the national-security realm raises concerns for the separation of powers' by intruding on the President's constitutional responsibilities in the area of foreign affairs." *Id.* (quoting *Ziglar v. Abbasi*, 137 S.Ct. 1843, 1861 (2017)). *Trump* involved the particular confluence of "admission and immigration", "national security", and "foreign affairs." *Id.* The Court referenced the specific need for deference when it recognized that "'Any rule of

1 constitutional law that would inhibit the flexibility' of the President 'to respond to changing world
2 conditions should be adopted only with the greatest caution,' and our inquiry into matters of entry
3 and national security is highly constrained." *Id.* at 2419–20 (quoting *Diaz*, 426 U.S. at 81–82).

4 The two policies at issue in the instant case do not inhibit the President from responding to
5 changing world conditions, nor do the policies touch on the specific areas of "admission and
6 immigration", "national security", and "foreign affairs" that the Supreme Court deemed warranted
7 the deferential standard laid out in *Trump*.

8 The Secretary argues that "[t]he Supreme Court further explained that this deferential
9 review may apply 'across different contexts and constitutional claims,' even when evaluating a
10 'categorical' classification 'on the basis of sex.'" Docket No. 127 at 19 (quoting *Trump*, 138 S.
11 Ct. at 2419). However, the Secretary fails to provide the fuller quotation wherein the Court stated
12 deferential review would be applied even in the context of a classification "on the basis of sex,"
13 because "'it is not the judicial role in cases of this sort to probe and test the justifications' of
14 *immigration policies*." *Trump*, 138 S. Ct. at 2419 (emphasis added). *Trump* dealt with the narrow
15 issue of an executive order regarding aliens abroad in the immigration context informed by foreign
16 policy and national security concerns. *Id.* at 2418. The language cited by the Secretary was
17 specifically related to the potential for the highly deferential review to apply to categorical
18 classifications on the basis of sex *in the immigration context*. *Id.*

19 The Ninth Circuit's recent decision, *Regents of the Univ. of California v. U.S. Dep't of
20 Homeland Sec.*, confirms the limited scope of *Trump*. In that case, the Ninth Circuit did not apply
21 the highly deferential standard articulated in *Trump* to a challenge of the U.S. Department of
22 Homeland Security's decision to rescind the Deferred Action for Childhood Arrivals ("DACA")
23 program, finding that case "differ[ed] from *Hawaii* in several potentially important respects,
24 including the physical location of the plaintiffs within the geographic United States, the lack of a
25 national security justification for the challenged government action, and the nature of the
26 constitutional claim raised." *Regents of the Univ. of California v. U.S. Dep't of Homeland Sec.*,
27 No. 18-15068, 2018 WL 5833232, at *31 (9th Cir. Nov. 8, 2018) (citing *Lopez-Valenzuela v.
28 Arpaio*, 770 F.3d 772, 781 (9th Cir. 2014) (en banc)). Other courts have refused to apply *Trump*

15

to challenges to discriminatory practices within the military. *See Stockman v. Trump*, No. EDCV1701799JGBKKX, 2018 WL 4474768, at *8 (C.D. Cal. Sept. 18, 2018) (Bernal, J.) (finding that *Trump* did not apply to a policy "banning transgender people from the military"); *Karnoski v. Trump*, 328 F. Supp. 3d 1156 (W.D. Wash. 2018) (Pechman, J.) (reiterating that the transgender ban in the military "is subject to strict scrutiny"). *Cf. Ramos v. Nielsen*, 321 F. Supp. 3d 1083, 1127–31 (N.D. Cal. 2018) (Chen, J.) (holding that "*Trump* did not address the standard of review to be applied under the equal protection doctrine when steps are taken to *withdraw* an immigration status or benefit from aliens lawfully present and admitted into the United States for reasons unrelated to national security or foreign affairs.").

Instead of *Trump*, the Court looks to *Rostker v. Goldberg* for the legal standard of reviewing gender based discrimination claims in the military context. There, the Supreme Court addressed the merits of whether a statute that allowed the President to require men and not women to register for the draft was constitutional. *Rostker v. Goldberg*, 453 U.S. 57 (1981). In that case the Court noted that

> The Solicitor General argues . . . that this Court should scrutinize the MSSA only to determine if the distinction drawn between men and women bears a rational relation to some legitimate Government purpose, and should not examine the Act under the heightened scrutiny with which we have approached gender-based discrimination. We do not think that the substantive guarantee of due process or certainty in the law will be advanced by any further "refinement" in the applicable tests as suggested by the Government. Announced degrees of "deference" to legislative judgments, just as levels of "scrutiny" which this Court announces that it applies to particular classifications made by a legislative body, may all too readily become facile abstractions used to justify a result. In this case the courts are called upon to decide whether Congress, acting under an explicit constitutional grant of authority, has by that action transgressed an explicit guarantee of individual rights which limits the authority so conferred. Simply labeling the legislative decision "military" on the one hand or "gender-based" on the other does not automatically guide a court to the correct constitutional result.

*Id.* at 69–70 (internal citations omitted). The Supreme Court rejected the Solicitor General's assertion of deferential rational basis review. *Id.* Instead, the Court examined the factual bases for the challenged policy of excluding women from selective service, examining the extent to which Congress carefully and thoughtfully decided to implement the draft for men only. *Id.* at 69–82; *see*

*also United States v. Virginia*, 518 U.S. 515, 573 (1996) (Scalia, J., dissenting) (describing *Rostker* as applying intermediate-scrutiny), *Pitts v. Thornburgh*, 866 F.2d 1450, 1455 (D.C. Cir. 1989) (citing *Rostker* as an example of one of "the many cases finding that even while the government favors a traditionally protected class with immediate benefits or exemption from an immediate burden, its acts are still subject to heightened scrutiny"). For example, the *Rostker* Court found that "[i]n light of the floor debate and the Report of the Senate Armed Services Committee . . . discussed, it is apparent that Congress was fully aware not merely of the many facts and figures presented to it by witnesses who testified before its Committees, but of the current thinking as to the place of women in the Armed Services." *Id.* at 71. The Court similarly recognized that "[n]o one could deny that under the test of *Craig v. Boren* the Government's interest in raising and supporting armies is an 'important governmental interest.' Congress and its Committees carefully considered and debated two alternative means of furthering that interest" and chose to only register men for the draft. *Id.* at 69. The Supreme Court did not just accept the conclusions of Congress, but evaluated how Congress reached its conclusion.

In this case, SWAN alleges that the Marine Corps segregated basic training "is premised on stereotypes about women's aptitude for military service." Docket No. 122 ¶ 8. Furthermore, the Leaders First policy "relegate[s] women, literally and figuratively, to a 'supporting role' in our Armed Forces based on stereotypes about women and assumptions about battlefield conditions that do not reflect the reality that women are already serving in combat situations, and doing so with distinction." *Id.* ¶ 40. SWAN pleads that as it relates to the implementation of these policies "the DoD's segregation policies are at least in part the result of animus towards servicewomen on the part of the DoD and the Administration." *Id.* ¶ 47. SWAN notes that "In 2015, Defendant Mattis . . . demonstrated his animus towards women soldiers when he proclaimed that women should not be allowed to serve in combat units because if they did serve, America's enemies would no longer fear 'America's awesome determination to defend herself.'" *Id.* ¶ 49.[3] The Secretary claims that

---

[3] SWAN seeks to include statements made by the Secretary after the filing of the TAC. Docket No. 132. SWAN requests under Local Rule 7-3(d) leave from the Court to submit an article and transcript of public statements made by the Secretary. Local Rule 7-3(d) states that "[o]nce a reply is filed, no additional memoranda, papers or letters may be filed without prior Court

17

Leaders First is based on studies such as the Gender Integration Study. Docket No. 127 at 20–21. It is not clear whether or to what extent these studies were considered in the formulation of the policy, unlike in *Rostker* where there was a clear record of debate, Senate Report, etc. At least for pleading purposes, SWAN's claims related to the Leaders First policy survive a motion to dismiss under *Rostker*.

With respect to the Marine Corps segregated basic training, the Secretary's stated justification is that "the training program is based upon the government's interest in maintaining the military readiness of the Marine Corps and not that of gender discrimination." *Id.* at 23. The Secretary also cites to a recent RAND Corporation report which "explained that by separating male and female recruits at the initial stages of MCRT, the Marine Corps '[s]eeks to raise expectations for individual performance, instill high levels of confidence, and maximize physical fitness while minimizing injuries' without distraction." *Id.* He also references a Congressional Commission study from 1999 which found that gender segregated training helped with combat readiness. *Id.* at 24. The Secretary, by referencing these documents but not properly requesting that the Court judicially notice them, asks the Court to assume the truth of them and assume that they were the basis for the proposed policies.[4] However, that is not the appropriate standard at the motion to dismiss stage. *Ponomarenko v. Shapiro*, 287 F. Supp. 3d 816, 826 (N.D. Cal. 2018) (citing *MGIC Indem. Corp. v. Weisman*, 803 F.2d 500, 504 (9th Cir. 1986) ("the Court's review on a motion to dismiss is limited to the four corners of the complaint.").

---

approval," except: "[i]f new evidence has been submitted in the reply, the opposing party may file and serve an Objection to Reply Evidence", or a Statement of Recent Decision. L.R. 7-3(d). SWAN does not assert that the transcript is in response to new evidence presented in the Secretary's Reply Brief, nor is this a Statement of Recent Decision. Therefore, the Court denies SWAN's request for leave to file additional statements by the Secretary.

[4] The Secretary in its motion to dismiss includes at least fifteen footnotes of various links for the Court to accept as true for the purposes of a motion to dismiss. Docket No. 127. The Secretary does so without properly requesting the Court judicially notice these documents. Additionally, the Ninth Circuit recently found that it was an abuse of discretion to judicially notice content that is subject to different interpretations, as many of the Secretary's cited footnotes require. *See Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1000 (9th Cir. 2018). For these reason, the Court grants the one lone request to judicially notice the fact that "President Trump, Secretary Mattis and Gen. (ret.) Kelly were not members of the Joint Chiefs of Staff on January 9, 2013." Docket No. 127 at 16 n. 9. The remaining citations that the Secretary cited to without a request for judicial notice shall be ignored by the Court for the purposes of the motion to dismiss.

For the purposes of a motion to dismiss, the Court must accept as true the factual allegations in the complaint. *Twombly*, 550 U.S. at 555. Here, SWAN has alleged that the Secretary has applied a facially discriminatory policy based on gender, and that the government offers no legitimate and substantial justification therefor. There may be a factual dispute as to the basis for the policies at issue, but SWAN has pled allegations that state a plausible claim for relief. The TAC pleads a plausible claim for relief under the Equal Protection Clause sufficient to survive a motion to dismiss. *Twombly*, 550 U.S. at 570.

The Secretary's motion to dismiss for failure to state a claim upon which relief can be granted is denied.

### III. CONCLUSION

The Court finds that SWAN has alleged sufficient facts to establish organizational standing to challenge both policies and associational standing to challenge the Marine Corps' segregated training policy. SWAN has not sufficiently alleged associational standing to challenge the Leaders First policy but is given thirty (30) days to amend. The Court also finds that SWAN has stated a claim upon which relief can be granted. For these reason, the Secretary's Motion to Dismiss is **DENIED** in part and **GRANTED** in part.

This order disposes of Docket No. 127.

**IT IS SO ORDERED**.

Dated: November 29, 2018

_____
EDWARD M. CHEN
United States District Judge